(No. 18403.—

The Philadelphia and Reading Coal and Iron Company, Plaintiff in Error, *vs.* The Industrial Commission *et al.*—(Anna Marek, Defendant in Error.)

*Opinion filed February 20, 1929.*

Hoag & Ullmann, (George M. Burditt, of counsel,) for plaintiff in error.

J. W. Koucky, for defendant in error.

Mr. Justice Duncan delivered the opinion of the court:

Defendant in error, Anna Marek, on February 18, 1926, presented to the Industrial Commission her application for compensation for the death of her husband, Alex Marek, an employee of plaintiff in error, the Philadelphia and Reading Coal and Iron Company, alleging that on January 20, 1926, "while carrying sacks of coal and loading them on wagons he sustained internal injuries," and that his death resulted from such accidental injury received in the course

of his employment. A hearing was had before an arbitrator, who found that defendant in error was not entitled to recover compensation. On her petition the case was reviewed by the Industrial Commission, which approved and confirmed the decision of the arbitrator. The record was reviewed by the circuit court of Cook county on *certiorari* proceedings, and that court on March 31, 1927, set aside the decision of the Industrial Commission and entered judgment in favor of defendant in error for $3750, payable in installments of $14 per week for 267-6/7 weeks. This court allowed a writ of error.

Alex Marek had on the day of his injury been employed by plaintiff in error at its coal yard at Irving avenue and Thirteenth street, in the city of Chicago, for twelve years or more. He was given by the company a house on its premises, with light and fuel, so it would have someone in its yards in case of fire or other casualty. He was fifty-four years old. He was a laborer and his usual occupation was tending a conveyor of anthracite coal, but since October, 1925, the company had not had anthracite coal at Chicago and after that date Marek worked with bituminous coal, which was kept in piles in the yard and supplied to dealers, who sent their wagons to the yard for it. The coal was loaded in the wagons loose or put in bags with handles on each side and then loaded into the wagons. He began his work at seven o'clock A. M. and usually worked ten hours, having a half hour off at noon for lunch. He also usually had ten minutes for lunch about nine A. M. and three P. M. When the coal in bags was to be loaded in the wagons, two men, one on each side of the bags, lifted them by their handles into the wagon to the driver. The bags of coal weighed from 80 to 100 pounds each. On January 20, 1926, Marek went to work as usual and worked until about two or three o'clock in the afternoon. The evidence is conflicting as to the hour he quit work. At that time he and Frank Kasper, another employee of plaintiff in error,

had just finished loading a wagon with bags of coal. Marek asked Kasper to look after the coal shovel and the fork and walked toward his home, which was from 70 to 100 yards away. Kasper testified for defendant in error that it was about three o'clock when Marek quit and that he did not know why he went home. In response to the question, "How did he walk?" he said, "He went good." Witness also said that there was nothing unusual in Marek's appearance or actions on that day. Marek walked to the back porch of his home, and Anna Marek testified that he sat down on a box on the porch and struck a match to light his pipe; that he told her he did not feel well, and while she was getting a glass of water he fell from the box and died shortly afterward. She also stated that she saw him coming toward the house and that he was stooped and appeared to be very tired and was pale in the face and that he tried to talk but could not do so. She said he went to work that morning about seven o'clock and that he seemed all right at that time, the same as on prior mornings.

Patrick Kennedy, foreman in the coal yard, called as a witness first by defendant in error and later by plaintiff in error, testified that at three o'clock witness told Marek to help put a load of coal in a wagon; that as soon as the wagon was loaded Marek "lit his pipe and went over to see if his wife was at home;" that he walked over to his house and in a short while his wife ran around the corner of the house calling for Marek's half-brother, who ran over to the house, followed by witness. Marek looked good and healthy on the morning of January 20, 1926. Witness talked to him and noticed nothing unusual in his appearance.

John Konen, a witness for plaintiff in error and a clerk in its office, testified as follows: He kept the records of the coal loaded in plaintiff in error's yard. On January 15 and to and including January 20, 1926, Marek and other employees were loading soft coal in the yards of plaintiff in error. On January 15 they loaded 31 tons and 1100

pounds; on January 16, 31 tons and 900 pounds; on January 18, 41 tons and 1500 pounds; on January 19, 23 tons and 600 pounds; and on January 20, 31 tons and 700 pounds. He was unable to state how much of the coal was loaded in bags on those days or how much was loose coal shoveled into the wagons. After one of the wagons was loaded on January 20, about three o'clock Marek started towards his home. He appeared to be just about the same on that day as on any previous day. He did not notice anything unusual in his appearance. He thinks that Marek for the last years of his life went to lunch about every day at about three o'clock in the afternoon. "Everybody [at the yards] went for lunch in the morning. That was a carry-over from the old beer period."

Myles J. O'Kelly, manager of the coal yards, testified that when the company was handling soft coal in January, 1926, the highest number of tons loaded would run from 90 to 100 in a day and to handle that amount of coal they would employ six men to load the wagons; that on January 20 the number of tons loaded was much less and they employed four men to do the loading at that time.

Dr. Albert J. Croft, who was called to attend Marek, testified for plaintiff in error that when he arrived at Marek's house he was lying on the kitchen floor; that his heart had a very weak beat; that witness commenced to use artificial respiration and punched the heart to stimulate its action; that he also pricked the heart with a needle and started the heart action again, but all efforts failed and Marek died shortly thereafter. Witness stated he made an examination and found no marks of any kind on the body and no evidence of external violence, and his opinion was that Marek died of heart disease. He found him to be a well developed man, about five feet eleven inches in height and weighing about 175 or 180 pounds.

Dr. Frank Kostal testified for defendant in error that he examined Marek on May 16, 1925, and found that he

had organic heart trouble, a varicocele and pyorrhea; that he had both systolic and diastolic heart murmurs at the apex, involving both the aortic and pulmonic valves, and that the heart was three-quarters of an inch behind the mid-clavicular and was increased in size.

Dr. Irving A. Porges, coroner's physician for Cook county, testified for defendant in error that he examined Marek's body after his death and found no external signs of violence or injury; that there was a deep cyanosis of the lips and finger tips, and witness came to the conclusion that Marek had died of organic heart disease, and that that was still his opinion. He stated that hard labor on the part of a man having such a heart as Dr. Kostal testified Marek had might tend to cause an acute dilation of the heart, and it was his opinion that hard labor would hasten the death of a person with such a heart. He stated that a man with such a heart would be likely to drop dead at any time, whether lifting or not.

Dr. Nathaniel H. Adams testified for defendant in error, in answer to a hypothetical question, that the necessary result of the work Marek was doing "would be to increase the blood pressure, and such an increase in the blood pressure, with a diseased heart, might with all reasonable certainty over-tax—over-dilate—the heart and result in his collapse and death." On cross-examination he stated that ordinarily persons with such a heart as Marek had die a lingering death, but that eight or ten out of each hundred such cases have a sudden death, and that sudden death occurs occasionally whether working or sitting quietly at home.

There is no evidence in the record of any unusual exertion or strain on the part of Marek shortly before his death. The work he did on the day of his death, while heavy work, was such as he usually did in the course of his employment. There is no evidence that any part of his body was torn or broken or otherwise injured, by exertion or otherwise. Furthermore, he did not collapse while at

work, but after having finished the job on which he was working, without any complaint of injury or sickness and with apparently nothing the matter with him, walked two hundred and ten feet or more and sat down before he collapsed. The cause of his death, according to the medical testimony, was organic heart disease. Where an employee dies from a pre-existing disease, which is aggravated or accelerated by an accidental injury in the course of the employment, the employer is liable for compensation for the death. (*Baggot Co.* v. *Industrial Com.* 290 Ill. 530; *Cameron, Joyce & Co.* v. *Industrial Com.* 324 id. 497.) There must in any case, however, be proof of an accidental injury arising out of and in the course of the employment, and the burden of proving that fact is upon the claimant. (*Libby, McNeill & Libby* v. *Industrial Com.* 326 Ill. 293; *Bell Telephone Co.* v. *Industrial Com.* 325 id. 102.) In *Jakub* v. *Industrial Com.* 288 Ill. 87, it appeared that while at work an employee collapsed and died of organic heart disease. The medical testimony in that case was that heavy work on the part of the employee, with his diseased heart, would hasten his death. This court held that there was no evidence tending to prove any accident or accidental injury to the deceased; that there was no mark upon his person and nothing from which it could be inferred that an accident had occurred, and that there was therefore no right shown for the recovery of compensation. That decision is controlling in this case.

The circuit court was not warranted in setting aside the decision of the Industrial Commission denying compensation, and its judgment is reversed and the award set aside.

*Judgment reversed and award set aside.*